UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAR CORPORATION,

    Plaintiff,

v.

NHK SPRING COMPANY, LTD and
NHK INTERNATIONAL INC.,

    Defendants.

Case No. 18-10613
Honorable Laurie J. Michelson

**OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [18]**

    Plaintiff Lear Corporation began sending letters about its patents to Defendant NHK Spring Company, LTD in 2006. While these letters were at first inquisitory, they became accusatory. Eventually, Lear accused NHK Spring of making an adaptive head restraint system that infringed its patents. NHK Spring responded to Lear's letters by explaining why it thought its headrest did not infringe or why Lear's patents were invalid. This back-and-forth letter exchange continued for four years. NHK's last letter, sent in August 2010, ended as follows: "In conclusion, it is NHK's position that its product does not infringe any of the Lear patents." Lear never responded.

    About three years later, Lear sued. But it did not sue NHK Spring or the other defendant in this case, NHK International Inc. Instead, it sued NHK Seating of America, Inc. Even so, Lear indicated early on in its case against NHK Seating of America that it might add NHK Spring as a defendant. Still, Lear made no attempt to do so until September 2017—about 11 years after it had first sent a letter to NHK Spring. Before the Court ruled on Lear's motion to add NHK Spring and NHK International, Lear filed a separate patent-infringement lawsuit against NHK Spring and NHK International. That is this case.

NHK Spring and NHK International now seek summary judgment. They argue that Lear's accusations of infringement beginning in 2006, followed by years of silence, led them to conclude that Lear was not going to sue, i.e., that they had finally persuaded Lear of noninfringement or invalidity. And Defendants say they relied on Lear's indication that they were in the clear. So if Lear were allowed to proceed now, they would be prejudiced. In other words, Defendants say that Lear should be equitably estopped from bringing their infringement claims.

While NHK Spring and NHK International have evidence of reliance on Lear's conduct, they have failed to establish that all reasonable juries would find that their reliance was prejudicial. For this reason and others set out below, the Court will deny Defendants' summary-judgment motion.

## I.

### A.

In 2002, NHK Spring, along with a company jointly owned by Lear and NHK Spring, General Seating of America, were making a seesaw-style adaptive head restraint. (ECF No. 28, PageID.995.) The production of this headrest was under a patent license from Lear. (ECF No. 28, PageID.995.)

By 2006, NHK Spring, with some direction or assistance from Toyota, was developing (or had already developed) a new adaptive head restraint. In NHK Spring's view, its new design was "substantially different from the seesaw design." (*See* ECF No. 28, PageID.997.)

Apparently, Lear had a different view. In July 2006, Lear's Acting Chief Patent Counsel ("Lear's In-House Counsel") wrote a letter to NHK Spring. (ECF No. 18, PageID.321.) In part, the letter stated, "it has come to our attention that NHK may be developing a vehicle seat active head restraint design for use with Toyota vehicles. Please let us know if the design is covered by

any of the licensed patents or requires use of technical information furnished by Lear. Please also provide information regarding the design to us so that we may consider your position." (*Id.*)

That same month, NHK Spring's Director of Intellectual Property Research ("NHK's IP Director") wrote back to Lear's In-House Counsel. (ECF No. 18, PageID.323.) In part, NHK's IP Director wrote, "It is true that NHK has developed a new seat active head restraint for Toyota vehicles, however, it is clear that this new mechanism has nothing [to do] with either LEAR patents or technical information." (*Id.*) The letter then went on to detail, in NHK's opinion, some of its innovations over the seesaw headrest. (*Id.*)

Lear's In-House Counsel then sent NHK's IP Director two more letters. In August 2006, Lear's In-House Counsel stated that the information provided was insufficient for Lear to decide whether the new headrest "is covered by U.S. Patent No. 5,378,043." (ECF No. 26, PageID.508.) And in November 2006, Lear's In-House Counsel sent a follow up letter.

At this point, outside counsel for NHK ("NHK's Outside Counsel") intervened and asked that Lear send all correspondences to him. (*See* ECF No. 18, PageID.326; ECF No. 26, PageID.511.) (It is not clear from the record whether this outside counsel was representing NHK Spring, NHK International, NHK Seating of America or some combination of the three.) Lear's In-House Counsel then sent NHK's Outside Counsel three follow-up letters (in January, March, and April 2007), but got no response. (ECF No. 26, PageID.511–513.)

In August 2007 (a year since the letter-writing had begun), Lear's In-House Counsel sent yet another letter to NHK's Outside Counsel. (ECF No. 26, PageID.514.) The letter stated in part, "We recently had the opportunity to review a head restraint system that we understand was provided by NHK for use on a Toyota Highlander vehicle seat. We wish to bring several Lear patents to your attention as they may be relevant to future marketing plans of NHK. Those patents

3

include U.S. Patent Nos. 6,655,733; 6,631,955; 6,631,949 and 5,378,043 (copies of which are enclosed)." (ECF No. 18, PageID.326.) (The '733, '949, and '043 patents are asserted in this case.) This time, NHK's Outside Counsel responded. He stated in part, "If Lear is alleging that any of the subject patents are infringed by NHK's head restraint design, then we request a detailed claim chart for each patent claim alleged to be infringed." (ECF No. 18, PageID.328.)

For the remainder of 2007 and all of 2008, NHK and Lear exchanged letters regarding Lear's patents and NHK's product. In December 2007, Lear's In-House Counsel sent NHK's Outside Counsel "a claim chart for claim 1 of U.S. Patent No. 6,631,949." (ECF No. 26, PageID.516–520.) He added, "We trust that this claim chart will help you with your evaluation of the '949 patent as well as other patents identified in my letter of August 8, 2007." (*Id.*) In February 2008, NHK's Outside Counsel responded in part: "In our review, we noticed that the claim chart does not show how each and every claim limitation is present in the NHK Spring product." (ECF No. 26, PageID.521–522.) In April 2008, Lear's In-House Counsel wrote in part: "As you requested, we have attached a revised claim chart that provides additional detail regarding movement of the headrest in first and second manners." (ECF No. 26, PageID.523–527.) In June 2008, NHK's Outside Counsel wrote a fairly-detailed letter explaining why the accused headrest did not infringe Lear's '949 patent. (*See* ECF No. 26, PageID.530–32.) The letter concluded, "For the reasons set forth above, substantial structural and functional differences exist between claim 1 of the '949 and the NHK Spring product. Accordingly, we ask that Lear please reconsider its position." (ECF No. 26, PageID.532.)

In 2009, more of Lear's patents came into play and Lear's outside counsel ("Lear's Outside Counsel") became involved. Skipping a few letters, in September 2009, Lear's Outside Counsel wrote to NHK's Outside Counsel: "This letter is sent for the purpose of resolving an infringement

4

claim." (ECF No. 26, PageID.538.) The letter referenced six of Lear's patents. (*Id.*) It also stated, "we have been corresponding with you since 2006 with no meaningful progress to date. If your client cannot resolve this matter with Lear in the very near future, Lear will be forced to take further action. As you know, your client's actions may also be exposing others to liability." (*Id.*) Lear's Outside Counsel's letter concluded, "In light of the above, we ask that you please respond to us by October 31, 2009 with a proposal to resolve this matter in a manner beneficial to Lear. As requested in my prior letter, please also identify the programs for which NHK is either manufacturing active head restraint systems in the U.S. or supplying such systems in the U.S." (*Id.*)

NHK's Outside Counsel's substantive response came in December 2009. (ECF No. 26, PageID.492–494.) In part, NHK's Outside Counsel wrote, "[T]he headrest mechanism in NHK's product does not infringe any claim of the Lear patents, including the newly raised U.S. Patent Nos. 6,955,397 and 7,455,357. In addition, NHK has uncovered prior art that invalidates the Lear patents." (ECF No. 26, PageID.492.) NHK's letter concluded, "For the reasons outlined above, it is NHK's position that its headrest product does not infringe any of the Lear patent claims, and further that these claims are invalid from the prior art. We would appreciate confirmation that our response fully resolves this matter, and that Lear will cease any further contacts with NHK's customers concerning same." (ECF No. 26, PageID.494.)

In June 2010, Lear's Outside Counsel sent NHK's Outside Counsel a rebuttal. The letter addressed NHK's claims of invalidity. (ECF No. 26, PageID.495–496.) And it included claim charts for three of Lear's patents. (*See id.*) Lear's Outside Counsel wrote, "These charts clearly show how at least the identified claims cover the NHK product and corresponding seat assembly." (ECF No. 26, PageID.496.) The letter concluded this way: "If the matter cannot be resolved in the

very near future, however, Lear will be forced to take further action. . . . As requested in my prior letter, please identify the programs for which NHK is either manufacturing active head restraint systems in the U.S. or supplying such systems in the U.S. We look forward to receiving your response." (*Id.*)

The last letter came in August 2010—more than four years after Lear's initial letter. As in prior letters, NHK's Outside Counsel explained why the accused headrest did not infringe. (ECF No. 26, PageID.502.) The letter ended as follows: "Accordingly, if Lear continues to assert these patents, then Lear should explain, in detail, how the claimed link assembly of these patents is found in the NHK product. In conclusion, it is NHK's position that its product does not infringe any of the Lear patents." (ECF No. 26, PageID.503.)

Lear never responded.

**B.**

But in July 2013, Lear sued. The suit was not against the two defendants in this case, however. Rather, Lear sued NHK Seating of America, Inc., which, according to Defendants, is the same company as General Seating of America (the Lear-NHK entity that produced the older, seesaw-style headrest). (ECF No. 14, PageID.185.) Even though Lear only sued NHK Seating of America, Lear arguably gave one of the defendants in this case notice that it might be sued. In a Rule 26(f) report filed in its case against NHK Seating of America, Lear provided, "The extent to which NHK [Spring] is involved in [making or selling the active headrest restraint] is unknown. If NHK [Spring] is involved, discovery will be needed regarding the extent of such involvement and, depending on the involvement, it may become necessary to add NHK [Spring] as a defendant." (Case No. 13-12937, ECF No. 13, PageID.165.)

For a number of reasons, including a multi-year *inter partes* review in the Patent Office, Lear's case against NHK Seating of America did not proceed quickly. And it was not until September 2017 that Lear sought to add NHK Spring and NHK International to its case against NHK Seating of America. (Case No. 13-12937, ECF No. 47.) This Court did not rule on that motion right away, and so, in February 2018, Lear filed a separate lawsuit against NHK Spring and NHK International.

In NHK Spring and NHK International's view, Lear threatened suit in July 2006 but did not actually sue until February 2018—a gap of almost twelve years. While the more relevant gap may be August 2010 (NHK's last letter) to November 2013 (when Lear mentioned adding NHK Spring to its case against NHK Seating of America), Defendants' point is that Lear threatened suit then fell silent for a number of years. And, according to them, this conduct led them to reasonably believe that Lear had given up—that Lear agreed with their non-infringement or invalidity positions. And after Lear fell silent in 2010, Defendants say they continued to make and sell their active headrest without modification; indeed, sales increased. Having now been called to answer for those sales, Defendants seek summary judgment on the basis of equitable estoppel. (ECF No. 18.)

**II.**

Unfortunately, the parties did not set out the legal framework governing Defendants' motion in detail. In fairness, it does often suffice to simply state that the movant is entitled to summary judgment if it shows both that there is "no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But here, the interplay between Rule 56 and the affirmative defense of equitable estoppel is intricate. So the Court will set out the framework in detail.

Under Rule 56, when a party moves for summary judgment on a claim or defense for which it bears the burden of proof at trial, it has the initial burden of production and, ultimately, must persuade the court that every reasonable jury would find in its favor. *See Villareal v. Buckle, Inc.*, No. 15-14382, 2017 WL 4310148, at *6 (E.D. Mich. Sept. 28, 2017) (Michelson, J.) (citing cases). And that is the situation here as equitable estoppel is an affirmative defense, *see SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 767 F.3d 1339, 1343 (Fed. Cir. 2014), and it is the defendants, NHK Spring and NHK International, that seek summary judgment.[1]

But equitable estoppel is a somewhat unique affirmative defense. As its name suggests, it stems from the courts of equity. *See Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996). And courts of equity could, but were "never required to submit any issue to a jury." *AIA Am., Inc. v. Avid Radiopharmaceuticals*, 866 F.3d 1369, 1374 (Fed. Cir. 2017); *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 446 (1830) ("[C]ourts of equity use the trial by jury only in extraordinary cases to inform the conscience of the court."). Consistent with equity practice, the ultimate decision of whether to equitably estop a patent holder rests with the "sound discretion of the trial court." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992), *other parts abrogated by SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954 (2017); *see also SCA Hygiene*, 767 F.3d at 1344

---

[1] *SCA Hygiene* has a lengthy but noteworthy subsequent history. The 2014 opinion just cited, 767 F.3d 1339, was vacated when the Federal Circuit decided to hear the case en banc. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, No. 2013-1564, 2014 WL 7460970, at *1 (Fed. Cir. Dec. 30, 2014). But then a majority of the en banc court "reinstate[d]" the 2014 opinion insofar as it dealt with equitable estoppel. *See SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 807 F.3d 1311, 1333 (Fed. Cir. 2015) (en banc). Although the en banc opinion was in turn vacated in part by the Supreme Court, the Supreme Court did not vacate the portion dealing with equitable estoppel. *See SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 967, 197 L. Ed. 2d 292 (2017). So, effectively, the portion of the 2014 opinion addressing equitable estoppel—which is the only portion this Court relies on in this opinion—is an en banc opinion of the Federal Circuit.

(providing that the trial court's "judgment in weighing all pertinent facts and equities" is reviewed for reasonableness). But the entire decision is not the court's. *See John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 887 F.3d 1322 (Fed. Cir. 2018) (describing a two-part standard of review). Each of the three necessary requirements for equitable estoppel to apply are questions of fact. *SCA Hygiene*, 767 F.3d at 1344 ("[T]he underlying elements of . . . equitable estoppel are questions of fact[.]").

Thus, combining the Rule 56 standard governing a defendant's summary judgment motion on an affirmative defense with the division of labor between jury and judge for a claim of equitable estoppel results in four inquiries. *One*: Would every reasonable jury find that "[Lear], through misleading conduct, led [Defendants] to reasonably believe that [Lear] did not intend to enforce its patent against [Defendants]"? *See Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010). *Two*: Would every reasonable jury find that "[Defendants] relied on that conduct"? *See id. Three*: Would every reasonable jury find that "due to [Defendants'] reliance, [they] would be materially prejudiced if [Lear] were permitted to proceed with its charge of infringement"? *See id. Four*: Assuming the answers to the first three questions are all "yes," how do other considerations inform the Court's discretion to apply equitable estoppel? *See SCA Hygiene*, 767 F.3d at 1343 ("[E]ven where the three elements of equitable estoppel are established, [a court must] take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense." (internal quotation marks omitted)).

### III.

Defendants have gone a fair way to showing that the answer to the first inquiry is "yes." Lear's last letter to NHK stated, "[t]hese charts clearly show how at least the identified claims

9

cover the NHK product and corresponding seat assembly" and "[i]f the matter cannot be resolved in the very near future, . . . Lear will be forced to take further action." (ECF No. 26, PageID.496.) But, following NHK's response of non-infringement, Lear did not "take further action"—at least not until years later. That seems to be a decent reason for Defendants to have thought they would not be sued. True, Lear argues that it did not then know "which NHK entity would be making or supplying AHRs for seats in the U.S., if any." (ECF No. 40, PageID.1306.) But if that is so, why did Lear go through the effort of preparing claim charts and exchanging letters with the NHK entities?

Ultimately, however, the Court does not decide whether Lear led Defendants to reasonably believe that it did not intend to enforce its patents. That is because answering the third equitable estoppel element suffices to resolve Defendants' motion.

And to answer that third question, a point of law serves as a good jumping off point. The Federal Circuit has sometimes articulated the three equitable-estoppel requirements in a way that suggests that the third element—prejudice—need not be tied to the accused infringer's reliance on the patentee's conduct. *See A.C. Aukerman*, 960 F.2d at 1041; *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016). But, in this Court's view, the better articulation is that the asserted prejudice must stem from the reliance. *See SCA Hygiene*, 767 F.3d at 1350 ("Equitable estoppel . . . requires that material prejudice to the accused infringer be caused by his reliance on the patentee's misleading communication."); *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010) (articulating the third element of equitable estoppel as, "*due to its reliance*, [the accused infringer] would be materially prejudiced" (emphasis added)); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992) (same). After all, if the prejudice stems from another source—say the passage of time between infringement and suit—then the

prejudice would have occurred even if the accused infringer had not relied on the patentee's conduct. And if that were the case, then the patentee's conduct would not be to blame for the prejudice and it would hardly seem fair to bar the patentee from suit for its conduct.

That point of law helps address Defendants' claim of evidentiary prejudice. They assert that one of the accused headrest designers died a few years ago and the other cannot testify due to a stroke a few years ago. (ECF No. 18, PageID.263.) Defendants further assert that certain of their documents relating to the development of the headrest, including correspondence with Toyota, are now lost or destroyed. (ECF No. 18, PageID.264.) Similarly, Defendants say that some of Lear's records that existed in 2007 or 2008 "no longer exist." (ECF No. 18, PageID.265–266.)

Defendants have not shown that any of this is attributable to its reliance on Lear's indication that it would not sue. As to the two designers, Defendants have not shown that their actions in response to Lear's silence led to the death of one or the other's stroke. As for the unavailable documents, Defendants have not shown that they (or Lear) had been preserving documents, but when it became clear that Lear was not going to sue, they stopped preserving the documents. In other words, Defendants have at most shown that they no longer have relevant evidence due to the passage of time. But Defendants need to show that they no longer have relevant evidence because of their response to Lear's indication that they would not be sued. Defendants' evidentiary prejudice argument seems to conflate laches with equitable estoppel.

Defendants also claim economic prejudice. In particular, Defendants have provided a declaration from Kazuyuki Okumura. At the time of Lear's last infringement letter in 2010, Okumura was the Senior Manager of NHK Spring's Legal Department; and when that department became the Risk Management Department in 2011, Okumura served as the Department's director.

11

(ECF No. 18-3, PageID.277.) Okumura appears to assert that NHK Spring relied on (1) Lear's failure to sue and (2) Lear's letters followed by silence.

Regarding the former, Okumura (with Defendants' clarification) says that it has a company policy that is only triggered by a lawsuit. (ECF No. 18, PageID.283; ECF No. 36, PageID.1281.) And he avers that if Lear had sued, NHK Spring would have "s[ought] its options." (ECF No. 18, PageID.283; *see also* ECF No. 18, PageID.284 ("[W]e would have considered measures to manage risk[.]").) Those options included reducing (or even halting) the production and sale of the accused headrest or redesigning the headrest to avoid Lear's patents. (ECF No. 18, PageID.283.) Because Lear did not sue Defendants until 2018, Defendants say they "had no need to implement [their] company policy" or "consider risk management measures." (ECF No. 18, PageID.284; ECF No. 36, PageID.1281.)

Focusing less on non-suit and more on Lear's threats followed by silence, Okumura further avers that NHK Spring "relied on the fact that Lear never responded to [its] August 20, 2010 letter, to conclude that it was not necessary to make any changes or modifications to the [adaptive head restraint] since Lear abandoned its claims of infringement." (ECF No. 18, PageID.283.) Lear's accusations followed by silence meant that "NHK [Spring] had no need to implement its company policy, or consider risk management measures in connection with the accused [adaptive head restraints]." (ECF No. 18, PageID.284.) "As a result, NHK [Spring] continued to make and sell the original AHR products without modification or re-design, and invested capital expenditures to reduce production cost in connection with the accused AHR product. Toyota's car sales volume in the U.S. that adopts the accused AHR product had been increased during the 2010-2013 time period." (ECF No. 18, PageID.284.)

12

Although these allegations support Defendants' position, taking the record as whole, a reasonable jury could still find that Defendants' reliance did not lead to economic prejudice. To start, the record permits the reasonable inference that between 2006 and the summer of 2010—the period when Lear was actively claiming infringement—Defendants were disputing the claim and making and selling the accused headrest. (*See* ECF No. 28, PageID.1019, 1227.) So, a jury could reason that Defendants had, despite Lear's claims of infringement, stayed the course of making and selling their headrest. And while Lear's subsequent silence might have given Defendants confirmation that their chosen course was safe (Okumura does say "we relied on the fact that Lear never responded to our August 20, 2010 letter, to conclude that it was not necessary to make any changes or modifications to the [adaptive head restraint] product"), what the record does not establish is that, had Lear not remained silent (i.e., sued or continued the letter campaign), Defendants would have changed course. In other words, had Lear sued in say, late 2010, Defendants may well have invoked the company policy only to conclude that Lear's patents were not infringed or invalid, and thus, their adaptive head restraint product could continue to be sold without modification. Indeed, if Defendants' August 2010 letter to Lear is to be taken at face value, that was Defendants' belief. (ECF No. 26, PageID.503.) Moreover, in November 2013, Lear put at least NHK Spring on notice that it might be roped into the suit against NHK Seating of America; yet Defendants point to no evidence that it tamped down production or redesigned their headrest in say, early 2014. Nor do Defendants cite any evidence they have reduced production or redesigned their headrest in the one year that this case has been pending against them. *See SCA Hygiene*, 767 F.3d at 1351 ("[G]enuine issues of material fact remain as to whether [the accused infringer] relied on its own opinion that the ′646 patent was invalid (or simply ignored the ′646 patent), rather than relying on [the patentee's] silence[.]").

In sum, while Defendants have clearly asserted that they (or at least NHK Spring) "relied on the fact that Lear never responded to [their] August 20, 2010 letter, to conclude that it was not necessary to make any changes," a reasonable jury could find that Defendants would have done the same regardless of what Lear did. In other words, Defendants have not shown that every reasonable jury would find that Lear's accusation-turned-silence was a difference maker in Defendants' production and sale of their headrests. That precludes summary judgment. *See SCA Hygiene*, 767 F.3d at 1350 ("Equitable estoppel . . . requires that material prejudice to the accused infringer be caused by his reliance on the patentee's misleading communication.").

## IV.

Because NHK Spring and NHK International have not shown that every reasonable jury would find the third equitable-estoppel requirement satisfied, there is no need to examine the other two requirements or consider any other facts bearing on the equities. Defendants' motion (ECF No. 18) is thus DENIED.

Consistent with earlier discussions about the resolution of their summary-judgment motion, Defendants have one week to inform the Court whether they still oppose consolidating this case with Lear's suit against NHK Seating of America. (*See* Case No. 13-12937, ECF No. 95.)

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: February 26, 2019

CERTIFICATE OF SERVICE

       I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, February 26, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

                                          s/William Barkholz
                                          Case Manager